1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE EASTERN DISTRICT OF TENNESSEE

3    ------------------------------------------------------

4    HANNAH ASHBROOK,                    )
                                         )
5            Plaintiff,                  )
                                         )
6    v.                                  )   No. 1:24-CV-00165-CLC-SKL
                                         )
7    MEIGS COUNTY, TENNESSEE,            )
     ET AL,                              )
8                                        )
             Defendants.                 )
9

10   ------------------------------------------------------

11                                    October 14th, 2024
                                      Decatur, Tennessee

12

13            DEPOSITION OF SAMUEL WHITING

14

15

16   ------------------------------------------------------

17

18                          COPY

19

20

21

22

23

24

25

CLEVELAND REPORTING COMPANY

P.O. BOX 693

Case 1:24-cv-00165-CLC-SKL   Document 37-1   Filed 12/31/24   Page 1 of 33

PageID #: 325

1    SAMUEL WHITING

2  called as a witness, being first duly sworn, was examined

3  and deposed as follows:

4    EXAMINATION

5  BY MR. CHANCEY:

6         Q.    What's your name, sir?

7         A.    Samuel Whiting.

8         Q.    Mr. Whiting, have you ever given a

9  deposition before?

10         A.    Yes, sir.

11         Q.    On how many occasions?

12         A.    There's one other occasion back prior to

13  me getting into law enforcement.

14         Q.    Okay.  What kind of case was that in?

15         A.    It was a case that I was involved in

16  against THP.  I had to go in for depositions on it.

17         Q.    Okay.  Well, my name's Franklin Chancey.

18  Have we ever met in person before?

19         A.    No, sir.

20         Q.    You've been served a subpoena to be here

21  today.  Is that correct?

22         A.    Yes, sir.

23         Q.    Can you tell us your address, please?

24         A.    My address is 355 Church Street, Decatur,

25  Tennessee.

**CLEVELAND REPORTING COMPANY**
P.O. BOX 693
CLEVELAND, TENNESSEE 37364-0693
(423-507-5225)

Case 1:24-cv-00165-CLC-SKL   Document 37-1   Filed 12/31/24   Page 2 of 33
PageID #: 175

1          Q.     What is your current occupation?

2          A.     Current occupation, I'm currently

3 unemployed. I do work for some family as far as helping

4 to maintain rental within this area, but I do a little bit

5 -- I'm more or less handyman at this point in time.

6          Q.     Before you were doing that, what was your

7 job?

8          A.     My job prior to that I served with the

9 Decatur City Police Department for approximately five

10 years.

11          Q.     Do you have any other law enforcement

12 experience other than for the Decatur City Police

13 Department?

14          A.     No, sir.

15          Q.     Do you have a POST certification?

16          A.     Yes.

17          Q.     Have you been to the police academy?

18          A.     Yes, sir.

19          Q.     When did you complete the academy?

20          A.     Let's see, I believe that was December of

21 2019, I believe. Might have been '18 actually when I

22 graduated from that.

23          Q.     And so when did you leave your position

24 with Decatur City?

25          A.     I left my position in February of '24.

1    Q.    What were the circumstances under which
2 you left that employment?
3    A.    To be honest, part of it was I just wasn't
4 making enough to sustain my family, pay our bills, stuff
5 like that.  My wife was going through kind of a rocky spot
6 with her job and so I went into another job where I was
7 going to be getting paid more.
8    Q.    Okay.  So you're married.
9    A.    Yes.
10    Q.    And you have children?
11    A.    Two.
12    Q.    Two.  How old are they?
13    A.    Got a seven year old and a four year old.
14    Q.    All right.  When you were employed at
15 Decatur City Police Department what were your jobs?
16    A.    Conduct traffic stops, do patrol,
17 investigating -- lightly.  We didn't do as much of that.
18 We did have an investigator; but when I was employed there
19 during nights, night shift and everything, I did do some
20 investigating as well.
21    Q.    As part of your job, did you have
22 occasions to come to the Meigs County Courthouse?
23    A.    Yes, sir.
24    Q.    What types of things would bring you to
25 the Meigs County Courthouse?

1   was being called over.

2       Q.   Okay.  So tell me what you recall about

3   being at the Meigs County Courthouse that day?

4       A.   So at the time of my arrival I was

5   currently standing outside the courthouse -- or, sorry,

6   not courthouse, the courtroom.  I was out there speaking

7   with I believe it was Chief Malone and I believe there was

8   another county deputy out there.  I can't recall who.  When

9   I got to the top, prior to me speaking with them I did

10  notice that one of the deputies was going down the elevator

11  with a prisoner in custody, whom I believe if I remember

12  correctly was Steven -- I'm forgetting his last -- Kelsey.

13      Q.   Okay.  Was Steven Kelsey somebody you

14  knew?

15      A.   He I believe at the time he was going to

16  court over an arrest that I had made on him prior.

17      Q.   Do you remember what the charges were?

18      A.   I believe it was evading arrest and

19  driving on revoked license and I believe I recovered some

20  drugs on him as well.

21      Q.   Do you remember what the drugs were?

22      A.   I believe it might have been

23  methamphetamine.

24      Q.   Were you at the courthouse because of

25  anything to do with Mr. Kelsey's case that day?

1          A.     At the time I was not aware.

2          Q.     All right.  So after you arrived at the

3 courthouse you came upstairs?

4          A.     Yes, sir.

5          Q.     So tell me what transpired after that.

6          A.     So after the deputy took Mr. Kelsey down

7 the elevator, I was standing outside speaking with some of

8 the other deputies that were up there and I was approached

9 by Ms. Ashbrook.  She was talking to me asking about her

10 boyfriend as far as what charges he was being charged with,

11 which I didn't know at the time as far as whether he was

12 being booked in over my charges or if it was something

13 else.  I still don't know what all transpired.  I think

14 they may have done a drug test on him as well.

15          Q.     Okay.

16          A.     But during the time that I was out there

17 speaking with her she was concerned for him and being a

18 little bit loud in the hallway, if I remember correctly.

19 I was trying to advise her as far as where she would have

20 to go as far as to see about getting him bonded out,

21 whatnot, and at that point in time it was ordered for her

22 to be given a drug test.

23          Q.     Okay.  I'm going to give you an

24 opportunity to see a video in this case.

25          A.     Okay.

1    with somebody.

2            Q.      What time was that?

3            A.      11:25.

4            Q.      All right.  And do you recognize the

5    person walking in the hallway now?

6            A.      Yes, sir.  That would be Ms. Ashbrook.

7            Q.      What time is that?

8            A.      It's 11 -- 11:25.

9            Q.      All right.

10                   (Video playing.)

11           Q.      What is Ms. Ashbrook doing?

12           A.      Currently I think she's trying to figure

13   out why her boyfriend was taken into custody, if I

14   remember correctly.

15           Q.      I apologize.  What do you see her doing

16   is my question.

17           A.      She appears to be upset.  She's slid down

18   the wall to the floor standing outside Ms. Petitt's office

19   on the phone.

20           Q.      Who is the officer approaching her?

21           A.      Deputy Doyle and Detective Crowe.

22                   (Video playing.)

23           Q.      Who do you see in the video now?

24           A.      Ms. Petitt, Detective Crowe, Ms. Ashbrook,

25   and myself.

1    Q.    If you can, narrate what you see moving

2  forward.

3    A.    Currently all officers involved walk down

4  towards Ms. Petitt's office.  I'm currently standing

5  outside of the door with Deputy Doyle and I believe they're

6  going over the test result.

7        (Video playing.)

8    Q.    What do you see at this point?

9    A.    At this point Ms. Ashbrook appears to be

10  in custody.  I was requested to transport her to the jail.

11    Q.    It appears you stopped and talked to

12  someone there.  Who were you talking to?

13    A.    I'm not a hundred percent sure.  It would

14  have either been the judge or possibly I think Brian Malone

15  may be around the corner.  I can't remember for certain.

16    Q.    Do you recall the judge saying anything?

17    A.    Not offhand.

18    Q.    Okay.  And did you then transport her to

19  the Meigs County Jail?

20    A.    Yes, sir.

21    Q.    All right.

22    MR. CHANCEY:  Now, if I can get you to

23  pull up Camera 11.

24    MR. RANDOLPH:  Same time stamp to start?

25    MR. CHANCEY:  It's a little slightly off,

**CLEVELAND REPORTING COMPANY**
P.O. BOX 693
CLEVELAND, TENNESSEE 37364-0693
(423-303-3325)

Case 1:24-cv-00165-CLC-SKL    Document 37-1   Filed 12/31/24    Page 8 of 33
PageID #: 181

1   seven or eight seconds difference between them.

2               MR. RANDOLPH:  About 11:20?

3               MR. CHANCEY:  Yeah.

4         Q.    (By Mr. Chancey)  Okay, we're going to

5   start this at 11:19:32 and can we agree that's a camera

6   looking in the opposite direction?

7         A.    Yes, sir.

8         Q.    From the one we just looked at on

9   Camera 9?

10        A.    Yes, sir.

11        Q.    Let me know what time it is when you

12  appear.

13        A.    Yes, sir.

14              (Video being played.)

15        A.    11:21.

16        Q.    11:21.  Is Ms. Ashbrook present at that

17  time?

18        A.    Not at this time.

19        Q.    It appears you're having a discussion.

20        A.    Yes, sir.

21        Q.    With who?

22        A.    Judge Stokes.

23        Q.    Do you recall what's being said?

24        A.    No, sir.

25              (Video playing.)

**CLEVELAND REPORTING COMPANY**
P.O. BOX 693
CLEVELAND, TENNESSEE 37364-0693
(423-693-2325)

Case 1:24-cv-00165-CLC-SKL    Document 37-1   Filed 12/31/24    Page 9 of 33
PageID #: 102

1    Q.    Tell us what you see now.

2    A.    Right now I see Deputy Christian

3 transporting Steven Kelsey to the elevator.  He's walked

4 off to retrieve something or talk to somebody.

5    Q.    Is Mr. Kelsey in cuffs?

6    A.    Yes, sir.

7    Q.    And does he have anything in his hand?

8    A.    He has a cell phone in his left hand.

9    Q.    Is he stopped in front of the elevator?

10    A.    Yes, sir.

11    Q.    Tell us what time he enters the elevator.

12          (Video playing.)

13    Q.    Did Judge Stokes pass Mr. Kelsey?

14    A.    Yes, sir.  11:24.

15    Q.    11:24?

16    A.    Yes, sir.

17    Q.    Now, where is the stairwell door?

18    A.    It's toward the end of the hallway on

19 the left.

20    Q.    I'd like you to tell me what time you

21 next see Ms. Ashbrook.

22          (Video playing.)

23    A.    11:25.

24    Q.    11:25.  Do you know where you are at this

25 moment?

1          A.     Currently I'm standing between the metal

2    detector and the courtroom doors.

3          Q.     What did you observe?

4          A.     She appears to be upset.  I believe this

5    is when we advised her that Steven was just taken back to

6    the jail and at this point in time is when it was advised

7    that she would be given a drug test, I believe.

8          Q.     Who advised that she was going to be given

9    a drug test?

10         A.     Judge Stokes.

11         Q.     Did you overhear that?

12         A.     Yes, sir.

13                (Video stopped.)

14         Q.     All right.  You had an opportunity to see

15   the video.

16         A.     Yes, sir.

17         Q.     Is this the first time you've seen the

18   video?

19         A.     Yes, sir.

20         Q.     Does it refresh your memory about the

21   sequence of events that occurred?

22         A.     It does.

23         Q.     All right.  So when did you first see

24   Ms. Ashbrook?

25         A.     When she approached toward the metal

1  detector where we were standing.

2  Q.    Did you overhear anything she said?

3  A.    I don't recall anything she said.  I know

4  that she was upset about Steven being arrested.

5  Q.    Well, did someone tell her he'd been

6  arrested?

7  A.    When she approached, I guess asking about

8  it, she was advised that he was being taken back into

9  custody and he'd already been brought down the elevator.

10  Q.    Do you recall what she said?

11  A.    No, not right offhand.  I don't remember

12  details.  I just know that she was upset about it.

13  Q.    Did she engage in any conduct that you as

14  a law enforcement officer would have thought violated the

15  law?

16  A.    She may have been a bit loud in the

17  hallway just as far as getting emotional with it.  But

18  other than her acting up outside the courtroom doors I

19  can't think -- there's nothing there that I would say that

20  she physically broke any laws as far as her actions, I

21  don't believe.

22  Q.    Would you have intended to arrest her for

23  disorderly conduct?

24  A.    No, sir.

25  Q.    Disturbing the peace?

**CLEVELAND REPORTING COMPANY**
P.O. BOX 693
CLEVELAND, TENNESSEE 37364-0693
(423-185-325)

Case 1:24-cv-00165-CLC-SKL    Document 37-7    Filed 12/31/24    Page 12 of 33
PageID #: 185

1    A.    No, sir.

2    Q.    You related that Judge Stokes said

3  to drug test her?

4    A.    Yes, sir.

5    Q.    What happened next?

6    A.    At that point in time she was escorted

7  down to Ms. Petitt's office where they retrieved the drug

8  test and they proceeded back down to the women's bathroom.

9    Q.    So what is the procedure when these tests

10  are being administered?

11    A.    So the procedure with -- most of the time

12  the individuals that I deal with are the male individuals

13  and everything and Ms. Petitt typically does all the

14  female drug tests obviously.  We usually stand by just as

15  security in case things got out of hand when it's a female

16  suspect.

17    Q.    So the female suspect goes into the female

18  restroom.

19    A.    Yes.

20    Q.    And where are you located at that point?

21    A.    Typically standing in the hallway or

22  outside the door.

23    Q.    From looking at the video where were you

24  in this case?

25    A.    In this case I was still down the hallway

1  next to the courtroom doors, I believe.

2  Q.   Could you tell who was at the door?

3  A.   I can't recall right offhand.

4  Q.   All right.

5  A.   I believe she may have been accompanied

6  by -- I know Ms. Petitt was accompanying her and at one

7  point or another I know I did walk down there, but I don't

8  remember how soon after.

9  Q.   Okay.  Were you present when Ms. Petitt

10  came out of the bathroom, --

11  A.   Yes.

12  Q.   -- out of the restroom?

13  A.   Yes.

14  Q.   Do you recall any discussion that took

15  place?

16  A.   I don't remember any detail as far as

17  what was said.  I do know at one point or another

18  Ms. Petitt did ask for assistance in the women's bathroom.

19  We believed that the suspect was giving her trouble; we

20  didn't know what the details were.  After it was -- after

21  we found out that there wasn't any kind of physical

22  altercation or anything I believe from memory we exited

23  and they proceeded with the drug test.

24  Q.   When you say giving her trouble, you mean

25  what?

1        A.     On occasion with these drug tests there

2 are suspects that tend to get a little rowdy with it and

3 they want to try to fight or refuse to do the drug test.

4 Ms. Petitt was hollering that she needed a deputy down

5 there from memory.

6        Q.     Okay.

7        A.     That's why we approached the door.

8        Q.     Do you know what had transpired that

9 required Ms. Petitt to ask somebody to come down there?

10       A.     No.  From the sounds of it I think she was

11 just at that time refusing to do the drug test or arguing.

12       Q.     Okay.  So after the test was concluded

13 what took place?

14       A.     At that point in time they went back to

15 Ms. Petitt's office where I believe they read the drug

16 results and everything and she was placed into custody.

17       Q.     Were you present when the results were

18 read?

19       A.     I was.

20       Q.     Do you recall what they were?

21       A.     I know she tested positive for multiple

22 different substances.

23       Q.     And I assume that this is a urine test.

24 Is that right?

25       A.     Yes, sir.

1          A.      No, sir.

2          Q.      And you're often there when there's a

3    drug test, correct?

4          A.      Yes, sir.

5          Q.      You had no reason to dispute the results

6    from Ms. Ashbrook's drug test, did you?

7          A.      No.

8          Q.      And when you were informed that Mr. Kelsey

9    had tested or had a dirty drug test that didn't surprise

10   you, did it?

11         A.      No, sir.

12         Q.      You had arrested Mr. Kelsey earlier in the

13   month for what you said, driving on revoked, evading

14   arrest, possession of drug paraphernalia, and possession

15   or something to do with methamphetamine?

16         A.      Yes, sir.

17         Q.      Did you ever ask or was told what

18   Mr. Kelsey had tested for at the courthouse?

19         A.      No, sir.

20         Q.      You weren't in the courtroom at all that

21   day, were you?

22         A.      No, sir.

23         Q.      You didn't have an opportunity to observe

24   Mr. Kelsey or Ms. Ashbrook.

25         A.      No, sir.

1    Q.    But when she learned about Mr. Kelsey

2    being arrested you observed her that she was upset about

3    that, correct?

4        A.    Yes, sir.

5        Q.    And you said that she was being loud in

6    the hallway, correct?

7        A.    Yes, sir.

8        Q.    And when you were transporting her -- did

9    you know her at all?

10        A.    Other than just from past experiences

11    dealing with Steven.  I've never had any actual issues with

12    her as far as having to arrest her or anything.

13        Q.    Dealing with her, how did you deal with

14    her?

15        A.    She's just usually with Steven.  I just

16    recognized her from being with him.

17        Q.    Was she with him the night that you

18    arrested him?

19        A.    She did arrive on scene later, yes.  She

20    wasn't in the vehicle at the time, but she showed up while

21    I was in the process of detaining him.

22        Q.    Did she protest you arresting him?

23        A.    Yes.

24        Q.    How so?

25        A.    Just verbally.  There was no physical

1    altercation.

2          Q.    When you say verbally what did she do?

3          A.    I'm sorry?

4          Q.    What did she say?

5          A.    I can't remember offhand what all she

6    said.  I know there was a lot of curse words thrown my way

7    as well as that it was a wrongful arrest, that I was

8    harassing them.

9          Q.    None of that was true, was it?

10         A.    No, sir.

11         Q.    So she was cursing you.

12         A.    Yes.

13         Q.    She told you that you were wrongfully

14    arresting him.

15         A.    Yes.

16         Q.    And she told you, you were harassing them.

17         A.    Yes, sir.

18         Q.    Other than that particular arrest, you

19    have dealt with her in the past also?

20         A.    Not necessarily dealt with her.  I've had

21    issues --

22         Q.    She was around when you dealt with

23    Steven.

24         A.    Yes, sir.

25         Q.    Tell me is that more than one other

1    occasion?

2            A.    I believe I've had maybe two prior

3    occasions besides the arrest that I did on Steven.

4            Q.    Okay.  Were they at their --

5            A.    At their residence.

6            Q.    At their residence?  Was this an

7    apartment?

8            A.    Yes, sir.

9            Q.    Tell me about one of those.

10           A.    So one of those incidences it was a he

11   had some form of warrant, I can't remember what it was for,

12   but I went over there to serve the warrant.

13           Q.    Okay.  And you said you had interaction

14   with her.

15           A.    Yes.

16           Q.    Can you describe that?

17           A.    I had a conversation with her at the door

18   prior to him being arrested.

19           Q.    Do you recall what was said?

20           A.    No, sir.

21           Q.    Do you recall any of her actions?

22           A.    No, sir.

23           Q.    Did she allow you to serve the warrant?

24           A.    Not at the time.  Steven came out

25   willingly shortly after.

1       Q.      Okay.  So he came out; she didn't let you

2   in.

3       A.      Yes.  Yeah, she denied that he was there.

4   I advised her that I knew he was there and shortly after

5   he ended up coming out.

6       Q.      So she didn't tell you the truth about

7   whether or not he was there.

8       A.      No, sir.

9       Q.      In fact, she denied that he was present.

10      A.      Yes, sir.

11      Q.      But he obviously was present, wasn't he?

12      A.      Yes, sir.

13      Q.      And he came out and you served him with a

14  warrant, correct?

15      A.      Correct.

16      Q.      Did she curse you that day?

17      A.      She did.

18      Q.      She did?

19      A.      Not nearly as bad as this last incident,

20  but she wasn't a very -- but she was not happy with me

21  arresting him.

22      Q.      When you say not nearly as bad, what do

23  you mean?  Let's talk about the last incident.  She cursed

24  you pretty badly?

25      A.      Yes.  She was very upset about that

1   incident.

2        Q.    And that's when she came to the vehicle?

3        A.    She -- I don't remember whose residence it

4   was.  It was off of -- I can't remember the name of the

5   road -- the road leading to the dump.

6        Q.    Okay.

7        A.    There's a residence over there I believe

8   that may be one of his cousins' where he drove to.

9        Q.    That's where you arrested him?

10       A.    Yes.

11       Q.    And that's one of the charges that I

12  spoke of earlier.

13       A.    Yes, sir.

14       Q.    And she came to that residence?

15       A.    Yes.

16       Q.    Do you know why she came to the residence?

17       A.    I'm unsure.

18       Q.    And that's when she cursed you pretty

19  badly.

20       A.    Yes.

21       Q.    And accused you of wrongful arrest and

22  harassment.

23       A.    Yes, sir.

24       Q.    Now, the time that you went to serve him

25  with a warrant did she accuse you of wrongfully arresting

**CLEVELAND REPORTING COMPANY**
P.O. BOX 693
CLEVELAND, TENNESSEE 1-423-
(#233-0043325)

Case 1:24-cv-00165-CLC-SKL    Document 37-1    Filed 03/31/24    Page 21 of 33
PageID #: 304

1   him?

2          A.    I don't believe she accused me of wrongful

3   arrest.  Like I say, I believe she did say a few choice

4   words and that she believed that it was BS that I was over

5   there serving the warrant.

6          Q.    Okay.

7          A.    But we didn't argue about it too much as

8   far as all I told her is that he was being arrested.  I

9   told her what he was being arrested for and from there he

10  was taken into custody.

11         Q.    Did she accuse you of harassing them in

12  any way?

13         A.    Not at that point in time.

14         Q.    Let's talk about when you say not at that

15  point in time you're talking about when she was there at

16  the arrest when you were serving the warrant?

17         A.    Not when I was serving the warrant.  That

18  was really -- I believe that may have been our first

19  interaction together.

20         Q.    Okay.  Now, you had another interaction

21  with Mr. Kelsey and Ms. Ashbrook at the same residence?

22         A.    The last incident I believe I had out

23  there, and I don't think they had anything to do with --

24  I think they may have called, there was an apartment fire

25  out there.

1        Q.    Okay.

2        A.    And nothing really transpired there.

3        Q.    But you saw Mr. Kelsey and Ms. Ashbrook

4 there?

5        A.    Yes.

6        Q.    What were they doing there?

7        A.    I believe they may have been the ones who

8 called in that they saw smoke coming from the apartment.

9 They were attempting to give me information as far as who

10 lived there, who may be possibly inside.

11        Q.    Can you think of anything Ms. Ashbrook

12 said that day?

13        A.    No, other than just describing the tenants

14 that lived there and that they may have a pet that was

15 inside the home at the time, which we were attempting to

16 locate.

17        Q.    Tell me the process of this particular

18 time when you served the warrant.  Did you physically take

19 Mr. Kelsey in custody that day?

20        A.    Yes, sir.

21        Q.    And you transported him to the jail?

22        A.    Yes, sir.

23        Q.    Did Ms. Ashbrook follow?

24        A.    I don't believe so.

25        Q.    So she understood you were removing him

1  from residence.

2          A.      Yes, sir.

3          Q.      Back to the day where we saw the video,

4  you said that you had seen her sliding up and down the

5  wall?

6          A.      Not up and down.  At one point or another

7  she did slide down the wall when she was upset.  I believe

8  she was on the phone.

9          Q.      On her phone?

10         A.      Yes.

11         Q.      Do you know who she was calling?

12         A.      No.

13         Q.      Did at any time during this particular

14  incident on May 11th, 2023, at this courthouse did you

15  ever hear her curse?

16         A.      Not to my knowledge.

17         Q.      Not in your presence.

18         A.      Not in my presence.

19         Q.      Did she ever say anything about Mr. Kelsey

20  being arrested, it was a wrongful arrest or more

21  harassment, anything like that?

22         A.      Not that I recall.  I'm trying to remember

23  as far as what was said out in the hallway area.  Like I

24  said, I know she was upset, but I don't remember anything

25  being brought up as far as Steven other than her asking why

1  he was being arrested and if she could bond him out, I

2  believe.

3          Q.    Okay.  You classified her as being upset.

4  What was it about what she was doing or saying that led

5  you to that conclusion?

6          A.    Her body behavior as far as how she was

7  acting going up and down the hallway -- or going down the

8  hallway.  She did have -- her voice was raised.  I can't

9  remember for a fact if there was any actual yelling or if

10  she was just -- if it was raised.  I mean, I know she was

11  not speaking in a normal tone.

12          Q.    You've been upstairs many times, correct?

13          A.    Yes, sir.

14          Q.    And business that's going on in the

15  Sessions Court is often conducted out in the hallway.  Is

16  that correct?

17          A.    At times.

18          Q.    Lawyers talk to their clients?

19          A.    Yes, sir.

20          Q.    Sometimes there's law enforcement

21  interaction out there?

22          A.    Yes, sir.

23          Q.    Lawyers talking to law enforcement

24  officers?

25          A.    Yes, sir.

1    Q.  Who asked you to transport Ms. Ashbrook?

2    A.  I believe it was Deputy Crowe.

3    Q.  And that was while you were up here?

4    A.  Yes.  We were discussing who would bring

5 her down to the jail, I believe.

6    Q.  And you transported her, correct?

7    A.  Yes, sir.

8    Q.  And you were nice to her.

9    A.  Yes, sir.

10    Q.  You certainly didn't injure her.

11    A.  No, sir.

12    Q.  You indicated that she wasn't completely

13 cooperative during the transport --

14    A.  As I said before, from memory I believe at

15 one point or another she did sit down at the floor rather

16 quickly and she was sitting there crying and arguing, but

17 like I said I -- at that point in time I did grab her by

18 the arm and was talking to her and told her she needed to

19 stand up, that we needed to go ahead and just get it over

20 with.

21    Q.  Was she handcuffed at that time?

22    A.  Yes.

23    Q.  So when she went down to the floor she

24 was already handcuffed?

25    A.  Yes.

1      Q.     She was crying she was handcuffed?

2      A.     Yes.

3      Q.     And her sitting down on the floor that
4 wasn't anything you asked her to do.

5      A.     No.

6      Q.     You wanted her to stand up so you could
7 transport her.

8      A.     Yes, sir.

9      Q.     Can you think of any other interactions
10 you've had with either Mr. Kelsey or Ms. Ashbrook?

11     A.     None right offhand.  Like I said, really
12 it's just those incidences where I've spoken with them
13 other than outside the jail.

14     Q.     I think you indicated to Mr. Chancey that
15 you left Decatur in February this year?

16     A.     Yes.

17     Q.     2024?

18     A.     Yes, sir.

19     Q.     Oh, the day of this incident were you in
20 a position to observe Mr. Kelsey as to whether or not he
21 was under the influence?

22     A.     No, sir.

23     Q.     What about her, could she have been under
24 the influence?

25     A.     It's possible.  Like I said, if I had had

1   time to observe her more I could give you a better answer.

2   But, like I said, it wasn't shortly after she entered the

3   hallway area that it was ordered for her to be given a drug

4   test.

5         Q.    When you say it's possible, what was she

6   doing that made you think maybe it's possible that she was

7   under the influence?

8         A.    Past experience of dealing with her.  It's

9   one of those ordeals where I wouldn't have been surprised

10  if you'd say that she was messed up on something.

11        Q.    Was she messed up in either of the two

12  occasions that you talked to her before?

13        A.    I don't know.  Like I said, my dealings

14  with her was strictly her being another person at the

15  scene.

16        Q.    Is it fair to say that at the time of

17  this incident when she was in the hallway she was not

18  acting normally?

19        A.    Yes, sir.

20        Q.    It's fair to say that?

21        A.    Yes, sir.

22              MR. KNIGHT:   That's all I have.

23                       EXAMINATION

24  BY MR. ROGERS:

25        Q.    Mr. Whiting, I'm Matthew Rogers.

1        A.     Yes, sir.

2        Q.     Good to see you here this morning, or

3 maybe it's afternoon now. When you arrived at the

4 courthouse, we watched that on video, that was the first

5 interaction you had with Ms. Ashbrook on May 11. Is that

6 correct?

7        A.     I believe so.

8        Q.     That day because you've told us about

9 your previous experience.

10       A.     Yes, sir.

11       Q.     You didn't observe her for more than

12 several minutes before you were in charge of transporting

13 her.

14       A.     Yes, sir.

15       Q.     So you didn't have an opportunity to

16 conduct any field sobriety testing --

17       A.     No, sir.

18       Q.     -- or anything other than those brief

19 observations. Is that correct?

20       A.     That's correct.

21       Q.     And you said that you believed based on

22 memory that when you passed the metal detectors there, you

23 talked to us about it, you think you heard Judge Stokes

24 order her to be drug tested?

25       A.     Yes, sir.

1    Q.    Do you remember what words were used that

2    particular time?  Was it drug test her, or, yes, she's the

3    one, or anything to that effect?

4    A.    I can't remember word for word, but I do

5    recall there being something said along the line of drug

6    test that woman, I believe.

7    Q.    Okay.  Could it have been test her or

8    check her out?

9    A.    Something to that degree.

10   Q.    Could have been any number of things?

11   A.    Yes, sir.

12   Q.    And do you know, and maybe you don't have

13   any foundation for this, but do you know whether when

14   Mr. Kelsey was tested it was at the direction of Judge

15   Stokes or not?

16   A.    I would assume so.

17   Q.    Do you know whether or not Judge Stokes

18   indicated to law enforcement that those two need to be

19   checked out or tested?

20   A.    I wasn't up there at the time of that.

21   I believe at one point or another there was an incident

22   inside the courtroom, but I don't know.

23   Q.    Have you talked to Ben Christian, the

24   county deputy, about this specific incident?

25   A.    No, sir.

1       Q.    Okay.

2       A.    Not to my memory.  We've not spoken since

3 that day, I believe.

4       Q.    Okay.  In Ms. Ashbrook's complaint it

5 alleged Mr. Christian was the one that pulled her up off

6 the ground by the arm, but you indicate to us here today

7 that that was you --

8       A.    Yes, sir.

9       Q.    -- that was appropriately touching her and

10 saying, Hey, come on, we've just got to get this over with?

11       A.    Yes, sir.  To my memory, I believe Ben

12 Christian was the one that transported him to the jail.  I

13 think he was still standing outside with Mr. Kelsey when I

14 arrived.

15       Q.    Okay.  And so he wouldn't have had an

16 opportunity to pick her up after she had been --

17       A.    No, sir.

18       Q.    -- in handcuffs.  Is that correct?

19       A.    That's correct.

20       Q.    And at no point in time during the year

21 2023 did you work for the county, Meigs County.

22       A.    No, sir.

23       Q.    Just the city.

24       A.    That's correct.

25       Q.    But you're still a resident here in

45

1 Meigs County.

2          A.     That's correct.

3          Q.     You weren't present for Mr. Kelsey's drug

4 test sample.  Is that correct?

5          A.     That's correct.  I arrived shortly after

6 I believe it was conducted.  I can't remember the time on

7 the video feed, but I know that they were already down

8 there conducting it when I arrived.

9          Q.     From the time that you heard whatever

10 direction or confirmation that Ms. Ashbrook was to be

11 tested did she indicate to you that she was refusing to be

12 tested or did she submit to the test?

13          A.     She did submit to the test.  She didn't --

14 from memory it doesn't seem that she knew why she was

15 being tested.  Again, she was using some, if I remember

16 correctly, she was using vulgarity, but it may have been

17 BS that this was happening.  I can't remember in detail as

18 far as what was being said.

19          Q.     Okay.  Did it surprise you that she was

20 positive for amphetamines?

21          A.     No, sir.

22          Q.     In your experience as a law enforcement

23 officer you've arrested actually her boyfriend before --

24          A.     Yes, sir.

25          Q.     -- for methamphetamine violations?

**CLEVELAND REPORTING COMPANY**
P.O. BOX 693

1      A.      Something along that line, I believe.

2      Q.      Do you remember specifically what she

3  told you happened when you were transporting her to the

4  jail?

5      A.      She just kept saying that she didn't

6  understand why it was happening to her, that she was there

7  in support of her boyfriend whom I had arrested and she

8  didn't know why she was being arrested and why she was

9  being drug tested.

10     Q.      And you were kind to her during this

11 transport, right?

12     A.      Yes, sir.

13     Q.      Even suggested she find a lawyer if she

14 disagreed, right?

15     A.      Yes, sir.

16     Q.      Did she object to the results of the test

17 or just to the fact that she was being tested?

18     A.      I believe to the fact that she was being

19 tested.

20     Q.      She never said, There's no way that I

21 tested positive for that, I don't do drugs?

22     A.      Not from memory.

23     Q.      Okay.  And you were kind and cordial and

24 professional with her even though you've had other

25 incidences where she would curse you and disagree with you.